**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| SAMONE T. PARKER, Individually and as Special Administrator of the Estate of Tonya L. Drapeau, deceased;<br><br>                    Plaintiff,<br><br>        vs.<br><br>THE UNITED STATES OF AMERICA, VISTA STAFFING SOLUTIONS, INC., NEVINE MAHMOUD, M.D., and ROBIN HARRIS, R.N.,<br><br>                    Defendants. | **8:18CV123**<br><br>**ORDER** |

This matter is before the Court on the Amended Motion for Leave to File Second Amended Complaint (Filing No. 141) and Motion to Compel Defendant United States' Discovery Answers (Filing No. 145) filed by Plaintiff, Samone T. Parker, and the Motion for Entry of Protective Order (Filing No. 167) filed by the United States. For the following reasons, the Court will deny Plaintiff's motion for leave to amend, grant in part Plaintiff's motion to compel, and grant in part the United States' motion for protective order.

**BACKGROUND**

Plaintiff, the Special Administrator of the Estate of Tonya L. Drapeau, filed this wrongful death and survival action against the defendants on March 20, 2018, and, after the Court granted the defendants' motion to dismiss Plaintiff's original complaint (Filing No. 41), Plaintiff filed an Amended Complaint (Filing No. 42) alleging the following facts:

In the early morning on March 21, 2016, Ms. Drapeau presented to the emergency department at Winnebago Hospital in Winnebago, Nebraska with breathing complaints. Dr. Nevine Mahmoud, M.D.; Robin Harris, a registered nurse; and Dena Neiman, a nurse practitioner—employees of Winnebago Hospital and Vista Staffing—evaluated Ms. Drapeau's condition. "While Ms. Drapeau was in the emergency department in the early morning hours of March 21, 2016, Dr. Mahmoud, Nurse Harris, and Nurse Neiman did not perform or request any labs on Ms. Drapeau, nor did they test or request any tests of Ms. Drapeau's blood sugar." Dr. Mahmoud diagnosed Ms. Drapeau with anxiety hyperventilation and discharged her. Ms. Drapeau

was a diabetic with a history of diabetic ketoacidosis ("DKA"), and had Dr. Mahmoud, Nurse Harris, or Neiman tested Ms. Drapeau's blood sugar during her first visit, they would have discovered she had DKA. In the afternoon on the same date, Ms. Drapeau was transported back to Winnebago Hospital by ambulance in critical condition. Lab tests performed during her second visit showed Ms. Drapeau's blood sugar level was abnormally high and she had DKA. Ms. Drapeau was life-flighted to a medical center in Sioux City, Iowa, and died two days later from DKA. See Filing No. 42.

Plaintiff's proposed second amended complaint adds new factual allegations and legal theories pertaining to Brandon Smith, a medical laboratory technician employed by the Great Plains Area Indian Health Service ("IHS") and the Winnebago Hospital. Plaintiff seeks leave to change her initial allegations that Dr. Mahmoud, Nurse Harris, and Nurse Neiman "did not perform or *request*" any labs or tests of Ms. Drapeau's blood sugar, and instead seeks to allege those individuals did not "perform or *obtain*" such tests. (Filing No. 141-1 at p. 4)(emphasis added). Plaintiff's new theory of negligence is that the IHS and Winnebago Hospital were required to have an operational clinical laboratory, and that Mr. Smith was required to perform lab tests on or for Ms. Drapeau on March 21, 2016, but did not due to Mr. Smith's "substance use, a medical condition, and/or dereliction of duty," and that the failures of the Winnebago lab and Mr. Smith contributed to Ms. Drapeau's death. (Filing No. 141-1 at pp. 5-6). Plaintiff also seeks to add allegations that IHS and Winnebago Hospital negligently hired, trained, and supervised Mr. Smith, resulting in Mr. Smith's failure to perform labs and testing on Ms. Drapeau. (Filing No. 141-1 at pp. 10-12). The pending discovery disputes arise, in part, out of Plaintiff's requests to conduct discovery into Mr. Smith and other laboratory personnel, the laboratory staffing agency, and the Winnebago Hospital's laboratory.

## ANALYSIS

### I.     Motion to Amend

Federal Rule of Civil Procedure 15 provides that the Court should "freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a). Nevertheless, a party does not have an absolute right to amend, and "[a] district court may deny leave to amend if there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or

futility of the amendment." *Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 922 (8th Cir. 2013) (internal quotation and citation omitted). The court has substantial discretion in ruling on a motion for leave to amend under Rule 15(a)(2). *Wintermute v. Kansas Bankers Sur. Co.*, 630 F.3d 1063, 1067 (8th Cir. 2011).

The United States opposes Plaintiff's proposed amendments as adding unsupported allegations that would be unduly prejudicial and would result in significant additional resources for discovery and trial preparation and will significantly delay resolving the dispute. (Filing No. 157 at p. 1). Plaintiff's proposed amendments change her previous allegations—that "Dr. Mahmoud, Nurse Harris, and Nurse Neiman did not perform or *request* any labs on Ms. Drapeau, nor did they test or *request* any tests of Ms. Drapeau's blood sugar"—to now allege that lab tests were not "performed or obtained" either because "(1) Dr. Mahmoud did not request labs on Ms. Drapeau because she knew she could not get those labs done at the hospital or (2) Dr. Mahmoud tried to order the labs but the laboratory could not fulfill those orders" because of to Mr. Smith's substance abuse and/or dereliction of duty and the lab's issues. *Compare* (Filing No. 61 at p. 4 - Plaintiff's Brief Opposing Defendant's Motion to Dismiss)(citing Filing No. 42 at p. 4 - Amended Complaint; Filing No. 50-2 at p. 11 - Palacios Declaration; Filing No. 62-2 at pp. 7-8 - Dr. Morgan's Letter) *with* (Filing No. 164 at p. 14). However, Plaintiff's proposed new allegations are contradicted by the evidence and Plaintiff's prior pleadings and representations to the Court. Allowing Plaintiff to file her proposed third complaint would be highly and unduly prejudicial and result in delay while Plaintiff conducts a fishing expedition into areas that are ultimately irrelevant to this medical malpractice and negligent hiring lawsuit, which arises out of the care provided by the treating medical professionals—Dr. Mahmoud, Nurse Harris, and Nurse Neiman—who first saw Ms. Drapeau in the emergency room in the morning on March 21, 2016.

With respect to the motion to amend, both the United States and Plaintiff cite to Dr. Mahmoud's deposition regarding the treatment and care she provided to Ms. Drapeau when Ms. Drapeau first arrived in the emergency room at the Winnebago Hospital on March 21, 2016. Review of Dr. Mahmoud's deposition demonstrates that Plaintiff should not be permitted to file a third complaint with the proposed new allegations. First, although Plaintiff asserts "Dr. Mahmoud tried to order the labs but the laboratory could not fulfill those orders" due to the Winnebago lab's issues, Dr. Mahmoud documented her clinical opinion in Ms. Drapeau's medical records that there was "no need for images or labs since all vitals are WNL [within normal limits]" and testified to

her opinion that there was "No need for blood work, no need for chest x-ray, patient is stable and everything is normal." (Filing No. 156-1 at p. 217, 276-77, 370). Dr. Mahmoud was questioned extensively about whether or not she requested laboratory testing and the reasons why she did not request any testing:

> Q. Did you consider ordering any tests for her to further evaluate her shortness of breath complaint?
> A. I did not -- I was going to consider if her symptoms were not improved and if her lungs were not clear, if there is any like abnormal lung sounds or if there are any physical findings, yes, I would order. But she did not have any other symptoms or signs to suggest to me ordering any unnecessary radiation or work.
>
> . . . .
>
> Q. So your testimony is there was no reason to order any imaging, including x-rays, to evaluate her shortness of breath –
> A. Correct. . . . My assessment was could be anxiety, could be hyperventilation, could be asthma exacerbation, could be like mild bronchitis. She improved with the slight oxygen. Could be because of her tobacco use. So these were my assessments.
> Q. What was your diagnosis?
> A My diagnosis was asthma exacerbation or anxiety. And she was anxious when she came in.
> Q. And what was the basis for your diagnosis of anxiety hyperventilation?
> A. She -- I think she told me that she's anxious. That's what I recall.

(Filing No. 156-1 at pp. 257-261).

Plaintiff's counsel continued to ask Dr. Mahmoud whether she requested labs and the reasons why she did not request labs or believe lab testing was clinically indicated:

> Q. Did you order any labs for Tonya Drapeau while she was at the hospital on the first visit in March 21st, 2016?
> A. No.
> Q. Did you order any urine tests on Tonya Drapeau when she at the hospital on the first visit on March 21st, 2016?
> A. No.
> Q. Did anybody order any labs, glucose tests, complete metabolic panels, complete blood count, urine dipstick, urinalysis or other urine tests for Tonya Drapeau during her visit -- her first visit to Winnebago on March 21st, 2016?
> A. No.
> Q. And you're a hundred percent certain that you didn't order any of those tests; correct?
> A. Yes.
> Q. Why didn't you order any of those tests or labs?
> A. Because she did not have any indication for these tests.

([Filing No. 156-1 at pp. 270-271](#)).  Plaintiff's counsel continued:

> Q. Did you ever consider ordering any of these labs or tests or lab work for Tonya Drapeau when she was at the hospital?
> A. You always consider a big variety when you see a patient in the emergency room. But when I evaluated her, I listened to her history of present -- like her presentation. I evaluated her, I found that there was no necessity of blood work or chest x-ray. It was unnecessary to expose the patient to pain of getting a lab, getting her more anemic, unnecessarily use resources, abusing the insurance company. Like there is no need and there is nothing I'm going to get from the blood work or the x-ray.
> Q. Any other reasons why you didn't order any lab work or tests on Tonya Drapeau?
> A. No, other than there was no indication, I did not have any other reason.
> Was there anything preventing you from getting these labs, blood work or urine tests done on Tonya Drapeau?
> A. No.

([Filing No. 156-1 at pp. 270-273](#)).  Later in the deposition:

> Q. All right. Were there any -- were there any labs, glucose tests, CBC's, complete metabolic panels, urine dipstick, urinalysis or other urine tests performed on Tonya Drapeau when she was at Winnebago Hospital on the first visit on March 21st, 2016?
> A. I answered that before. No.
> . . .
> Q. If you had ordered those tests for [Ms. Drapeau], though, would you have let her leave the hospital before the results got back?
> A. I wouldn't order them, . . .
> . . .
> Q. Why didn't you do a finger prick to test Tonya Drapeau's blood glucose in the emergency department?
> A. Because we don't do that on every patient unless they have symptoms or signs suggestive to order the test.

([Filing No. 156-1 at pp. 280](#), 282, 288).

Plaintiff asserts in her brief, without citation, that "Dr. Mahmoud also admitted she was not able to order any labs when Ms. Drapeau was at the hospital because of the problems with Mr. Smith." ([Filing No. 142 at p. 2](#)).  Counsel's statement is, at best, misleading.  Review of Dr. Mahmoud's deposition above, and continued below, demonstrates that she repeatedly testified that the state of the Winnebago Hospital's lab had nothing to do with why she did not order labs during Ms. Drapeau's initial visit, and had Dr. Mahmoud thought labs needed to be ordered, she could have done so.  Dr. Mahmoud's actual deposition testimony is as follows:

Q: How many laboratories were there at Winnebago Hospital on March 21, 2016?
A: It's only one facility lab. . . .
Q: All right. And if that laboratory wasn't operational, did you have a place where labs could be sent?
A: Yes.
Q: Where is that?
A: At a near hospital.
. . .
Q: Had you ever done that before March 21st, sending labs to a different hospital to be done?
A: I think, yes, they send some labs outside and some of the labs we can't process in the hospital. . . .
Q: Do you know who operated the lab at the hospital?
A: The people who are responsible for the lab, but I don't know their names.
Q: Okay. And how many people were working at the lab on March 21st, 2016?
A: I -- I don't know.
Q: Okay. Do you know a person by the name of Brandon Smith?
A: I don't recall that name.
Q: You've never heard of the name Brandon Smith ever? . . .
A: Is he a lab technician or the director?
Q: A lab technician.
A: A lab technician. His name is like -- Brandon, but lots of people named Brandon. So I wouldn't remember Brandon, I'm sorry.
Q: Well, if the lab wasn't operational on March 21st, 2016, you didn't have a place for those labs to be done on a patient that presented to the emergency department; correct?
A: Inaccurate, because we have the ability to send the labs outside.
Q: Where would you have sent them?
A: To the nearby hospital.

(Filing No. 156-1 at pp. 301-304).  Dr. Mahmoud remained consistent in her testimony that the staffing of the Winnebago Hospital's lab did not affect her decision to not order labs the first time Ms. Drapeau presented in the emergency room of the Winnebago Hospital:

Q: All right. So you don't know if there was anybody working in the lab in the early morning hours of March 21st, 2016, at Winnebago Hospital; correct?
A: What I recall from the memory, that there was a problem -- that there was -- like the lab was -- we are not able to get labs in the hospital and if we need something, we can send outside. That's what I recall.
Q: And how is it that you recall that?
A: They say that he's like sick or something.
Q: Who said that?
A. Like people in the -- in the department, like nurses . . . And then I remember -- I remember now that that night they ask me "Would you like to get the labs sent out?" And I said "No, there is no need."

([Filing No. 156-1 at pp. 309-310](#)).  Plaintiff's counsel continued:

> Q: So the real reason that you didn't order any labs on Tonya Drapeau was because of the problems that the lab worker was having; correct?
> [Objection]
> A: Incorrect. . . .
> Q: The real reason that you didn't order any labs on Tonya Drapeau was because the lab at Winnebago Hospital, when she was there on March 21st, 2016, was not operational –
> A: I said incorrect.

([Filing No. 156-1 at p. 313](#)).  Plaintiff's counsel persisted:

> Q: Did you -- were you upset that the lab was not operational on March 21st, 2016? . . .
> A: No, it did not upset me, because simply it did not affect my patient care. I still continued to take care of my patients and send outside to another lab if I needed something.

([Filing No. 156-1 at pp. 316-317](#)).

Plaintiff points to a medical bill dated March 21, 2016, as a sort of "smoking gun" showing that show labs may have in fact been ordered by Dr. Mahmoud during Ms. Drapeau's first emergency room visit in the morning.  ([Filing No. 156-3](#)).  However, review of that bill simply shows all the tests that were ordered and charged to Ms. Drapeau for March 21, 2016—it does not make any mention of when these tests were ordered.  Ms. Drapeau's medical records at [Filing No. 156-4](#), do, however, contain the times the March 21, 2016, labs were ordered, the time the results were obtained, and what the results were.  For example, the medical bill cited by Plaintiff shows a charge for a single "HCG" lab with a billable code of 84703.  ([Filing No. 156-3](#)).  Ms. Drapeau's medical records show that a Dr. Ahmed Mohamed ordered one HCG lab with the billable code 84703 on March 21, 2016, at "17:25" (5:25 p.m.) and the "Result Date and Time" was March 21, 2016, at "17:29:09" (5:29 p.m.) ([Filing No. 156-4 at pp. 22-23](#)).  Similarly, Ms. Drapeau was billed for one "Urine Dipstick" lab with billable code 81003 on March 21, 2016, ([Filing No. 156-3](#)), and her medical records show that one "Urine Dipstick" lab with billable code 81003 was ordered by Dr. Ahmed Mohamed on March 21, 2016, at "17:11" (5:11 p.m.).  ([Filing No. 156-4 at p. 15](#)).  Indeed, [Filing No. 156-4](#) shows that all the lab tests performed on March 21, 2016, were ordered after 5:00 p.m.  This is consistent with Plaintiff's earlier representations and the evidence before the Court that Dr. Mahmoud requested no labs the early morning hours on March 21, 2016, before diagnosing Ms. Drapeau with anxiety hypertension and releasing Ms. Drapeau from the hospital,

but that lab tests were requested and performed later in the evening when Ms. Drapeau returned to the hospital on the same date.

Simply stated, Plaintiff's proposed third complaint adding a theory that Brandon Smith and the Winnebago Hospital's lab were a proximate cause of Ms. Drapeau's death is not based on facts or evidence gathered during discovery in this case and contradicts the facts previously asserted by Plaintiff. The treating physician who initially saw Ms. Drapeau testified she did not request lab tests because she did not think they were not clinically indicated, she could have ordered lab tests had she believed they were necessary, and that the condition or staffing of the Winnebago's lab did not factor into her decision-making process. Certainly, whether Dr. Mahmoud should have requested lab tests and whether her actions comported with the applicable standard of care is still a question to be determined by the fact-finder, but Brandon Smith and the Winnebago Hospital laboratory cannot be a proximate cause of Ms. Drapeau's death by failing to perform lab tests that were never requested by a treating physician who believed such tests were not clinically indicated. Therefore, permitting Plaintiff to amend her complaint a second time to add new allegations and conduct expansive discovery into areas contradicted by the evidence is unduly prejudicial.[1]

The United States' arguments regarding prejudice are not hypothetical. Plaintiff's motion to compel and the United States' motion for protective order concern Plaintiff's voluminous discovery requests and a Rule 30(b)(6) deposition notice that broadly seeks information regarding the Winnebago Hospital's laboratory, laboratory policies, Brandon Smith and other laboratory staff, and laboratory-related inquiries. Plaintiff also seeks to serve a Rule 45 subpoena duces tecum to a non-party, Titan Medical Group, that staffed Brandon Smith at Winnebago Hospital. None of the extensive discovery requested by Plaintiff regarding Brandon Smith or the Winnebago

---

[1] It also appears Plaintiff's proposed amended claim for negligence based on Brandon Smith's conduct and the staffing of the Winnebago Hospital's laboratory may not have been administratively exhausted such that the Court would have jurisdiction over that claim. (See Filing No. 157 at p. 11). Parker's Standard Form 95 "Basis of Claim" section states "Winnebago Indian Health Services Hospital [ ] and health care providers there who *treated* Tonya Drapeau on 3/21/2016 were professionally negligent." (Filing No. 62-2 at p. 1). The summary in additional pages to the Standard Form 95 assert "WIHSH and health care providers at WIHSH *failed to perform a proper differential diagnosis on patient*, *failed to order proper tests*, failed to provide appropriate health care to the patient, failed to timely admit patient to a hospital for more specialized care, and discharged patient home rather than admitting her to a hospital for further care." (Filing No. 62-2 at p. 5)(emphasis added). There is no suggestion in Plaintiff's Standard Form 95 that her allegations of negligence implicate the condition of the Winnebago's laboratory or Brandon Smith, as the allegations arise from the emergency room health care providers' failure to diagnose, treat, and order appropriate tests. If Plaintiff was granted leave to amend to add the claims against the laboratory, the United States reasonably may consider filing a motion to dismiss that claim based on a failure to exhaust administrative remedies. But, the assigned district judge would make the definitive ruling on that issue, and the Court's denial of Plaintiff's motion for leave to amend is not based on any failure to exhaust and futility argument.

Hospital's lab is relevant to the claims and defenses in this case. See *Jacobs v. Fareportal, Inc.*, No. 8:17CV362, 2018 WL 6107064, at *1 (D. Neb. Nov. 21, 2018)("When deciding whether allowing an amendment will prejudice the opposing party, the court must consider whether asserting new counterclaims will require expending significant additional resources on discovery and trial preparation, or significantly delay resolving the dispute."). The Court does recognize its consideration of the over 1200 pages of documents and arguments submitted in connection with these motions caused considerable delay in and of itself; nevertheless, further delay and resources will be expended if Plaintiff is granted leave to file a third complaint that adds new allegations contradicted by the evidence. Therefore, Plaintiff's motion for leave to file a second amended complaint will be denied.

## II.     Discovery Motions

Plaintiff filed a Motion to Compel (Filing No. 145)[2] asking the Court to order the United States to supplement its answer to Interrogatory No. 17 and seventeen requests for production of documents, and to perform additional ESI searches. The United States filed a Motion for Protective Order (Filing No. 167) to limit the content and scope of the majority of Plaintiff's fifty-five topics in the Rule 30(b)(6) Deposition Notice directed to the IHS, and to prohibit Plaintiff from issuing a Rule 45 Subpoena Duces Tecum to Titan Medical Group, LLC, the contracting company that provided Brandon Smith and other lab contractors to the Winnebago Hospital lab. Although the Court's denial of Plaintiff's motion for leave to amend resolves the disputes regarding Brandon Smith and other lab-related inquiries, as that discovery is not relevant to any claim or defense in this case, several additional disputes remain.

The scope of discovery permits parties to obtain "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely

---

[2] Plaintiff's motion does not contain a certificate in accordance with Fed. R. Civ. P. 37(a)(1), which provides that a party moving for an order compelling disclosure or discovery "must" include in the motion "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1).

benefit." Fed. R. Civ. P. 26(b)(1). Rule 26(b)(2)(C)(i) requires a court to limit the "frequency or extent of discovery otherwise allowed" where the Court finds that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" or if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii). Under Rule 26(c), courts have broad discretion in deciding whether protection is warranted and in determining the type and terms of protection to be ordered. See *Northbrook Digital, LLC v. Vendio Servs., Inc.*, 625 F. Supp. 2d 728, 757 (D. Minn. 2008)(citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36-37 (1984)).

### A. Plaintiff's Motion to Compel (Filing No. 145)

Plaintiff moves the Court to compel the United States to supplement seventeen requests for production and one interrogatory, perform supplemental ESI searches using Plaintiff's terms, date ranges, and custodial locations, and for an award of attorney's fees. (Filing No. 146 at p. 2).

A party resisting a motion to compel "has the burden of showing its objections are valid by providing specific explanations or factual support as to how each discovery request is improper" and also "has the burden to show facts justifying its objection by demonstrating that the time or expense involved in responding to requested discovery is unduly burdensome." *Online Res. Corp. v. Joao Bock Transaction Sys., LLC*, No. 8:13CV231, 2014 WL 5173118, at *4 (D. Neb. Oct. 14, 2014)(Thalken, M.J.)(citing *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511-12 (N.D. Iowa 2000); *Wagner v. Dryvit Sys.*, Inc., 208 F.R.D. 606, 610 (D. Neb. 2001)). However, "A party resisting facially overbroad or unduly burdensome discovery need not provide specific, detailed support." *Carlton v. Union Pac. R. Co.*, No. 8:05CV293, 2006 WL 2220977, at *5 (D. Neb. Aug. 1, 2006)(Thalken, M.J.)(quoting *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 665 (D. Kan. 1999)(citation omitted)). "Although the burden of demonstrating the proportionality of the requested information is a collective responsibility between the parties and the court, a party requesting discovery must show how the requested information is important to the issues and resolution of the case." *Doe v. Bd. of Trustees of Nebraska State Colleges*, No. 8:17CV265, 2018 WL 4190056, at *1 (D. Neb. Aug. 31, 2018)(Zwart, M.J.). And, "[w]hile the standard of relevance in the context of discovery is broader than in the context of admissibility, . . . this often intoned legal tenet should not be misapplied so

as to allow fishing expeditions in discovery." *Id.* (quoting *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)).

### i. Interrogatory No. 17

Plaintiff seeks supplementation of Interrogatory No. 17. Plaintiff agreed in her brief to limit this interrogatory "to only seek the dates and locations of the places where Dr. Mahmoud worked for Indian Health Services and Winnebago Hospital." (Filing No. 145-2; Filing No. 146 at p. 9). The United States responded this is the first time Plaintiff agreed to limit this interrogatory in this way, and objections notwithstanding, the United States "will endeavor to verify whether Dr. Mahmoud worked at the facilities that she disclosed and on what dates." (Filing No. 172 at p. 15). Plaintiff indicates this dispute is now resolved, assuming the United States supplements its answer as stated above. (Filing No. 182 at p. 18).

### ii. Requests for Production of Documents

Plaintiff requests the Court order the United States to supplement Request for Production Nos. 10, 14-16, 36-40, 42, 47, 49-51, 53, 54, and 63 and to perform supplemental ESI searches using Plaintiff's terms, date ranges, and custodial locations, and for an award of attorney's fees. (Filing No. 146 at p. 2). The majority of United States' objections to Plaintiff's requests for production are that the requests are overly broad in scope and timeframe, seek irrelevant information, are not proportional to the needs of the case, are cumulative or duplicative, and seek medical quality assurance records protected from disclosure under 25 U.S.C. § 1675.[3]

First, the Court will address the scope of the medical quality assurance records privilege under 25 U.S.C. § 1675, which the United States has raised in response to fifteen disputed requests for production. Those requests seek documents and communications regarding the termination or discontinuation of services and healthcare treatment provided by or to the defendants (Req. No. 10); corrective or remedial action taken by the defendants in response to immediate jeopardy citations (Req. No. 14); Centers for Medicare & Medicaid Services ("CMS") enforcement letters and noncompliance determinations (Req. No. 15); audits, evaluations, and investigations of nursing, medical services, and other healthcare delivery services at Winnebago Hospital (Req. No. 16); disciplinary actions, revocations, or suspensions of medical and nursing licenses of the

---

[3] The United States has withdrawn objections based on the Nebraska state law peer review privilege. (Filing No. 172 at p. 13 n.2).

defendants (Req. No. 36); training and education (Req. No. 37), medical licenses (Req. No. 38), and curricula vitae and resumes (Req. No. 40) of the defendants; medical and hospital privileges afforded to the defendants (Req. No. 39); chart reviews, medical record reviews, and health information management reviews for services and treatment provided to Ms. Drapeau at Winnebago Hospital (Req. No. 47); performance evaluations, quality assurance evaluations, and quality control evaluations of the defendants (Req. No. 49); Ongoing Professional Practice Evaluations ("OPPE") and Focused Professional Practice Evaluations ("FPPE") for services or work provided by the defendants for the Winnebago Hospital (Req. No. 50); bylaw attestation statements (Req. No. 51); documents provided by the defendants for the IHS' credentialing checklist (Req. No. 53); and documents regarding the credentials or credentialing of the individually named defendants and contracting agencies (Req. No. 54). The United States provided Plaintiff with privilege logs of certain withheld documents, (Filing No. 171-4; Filing No. 171-13; Filing No. 171-14; Filing No. 171-15), but also generally raises the privilege for unspecified documents that may exist responsive to these requests.

Under 25 U.S.C. § 1675, "Medical quality assurance records created by or for any Indian health program or a health program of an urban Indian organization as part of a medical quality assurance program are confidential and privileged. Such records may not be disclosed to any person or entity," with certain exceptions. 25 U.S.C. § 1675(b). "[N]o part" of such medical quality assurance record is subject to discovery or admissible as evidence in any judicial proceeding, and an individual who reviews or creates such records may not be required to testify regarding the records, with certain exceptions. 25 U.S.C. § 1675(c). The statute defines a "medical quality assurance program" as:

> any activity carried out before, on, or after March 23, 2010, by or for any Indian health program or urban Indian organization to assess the quality of medical care, including activities conducted by or on behalf of individuals, Indian health program or urban Indian organization medical or dental treatment review committees, or other review bodies responsible for quality assurance, credentials, infection control, patient safety, patient care assessment (including treatment procedures, blood, drugs, and therapeutics), medical records, health resources management review, and identification and prevention of medical or dental incidents and risks.

25 U.S.C. § 1675(a)(2). A "medical quality assurance record" is defined as "proceedings, records, minutes, and reports that--(A) emanate from quality assurance program activities . . .; and (B) are produced or compiled by or for an Indian health program or urban Indian organization as part of a

medical quality assurance program." 25 U.S.C. § 1675(a)(3). Subsection (d) sets forth the exceptions permitting disclosure of medical quality assurance records or related testimony, none of which are arguably applicable to this litigation. See 25 U.S.C. § 1675(d). Few courts have had an opportunity to consider the scope of the medical quality assurance privilege contained in this section, but one court to do so in a dental malpractice case afforded the statute a broad reading "in light of the statute's policy of encouraging medical institutions to improve their level of patient care and make appropriate corrective or preventative measures." *Soto v. United States*, No. 13-CV-2359-BAS DHB, 2014 WL 4704594, at *3 (S.D. Cal. Sept. 22, 2014)(concluding emails, handwritten notes, information printed from an internet site, and reports were privileged as "records" that "emanated" from medical quality assurance program activities).

The United States asserts the statute's confidentiality provisions are broadly drafted, unwaivable, and include protection of all activities related to the IHS' credentialing and privileging process. (Filing No. 172 at p. 21). Plaintiff argues the privilege described by the statute is narrow and inapplicable to any of her discovery requests or deposition topics, and that the United States has not met its burden to establish the applicability of the privilege to any specific discovery in this case. (Filing No. 182 at pp. 6-14).

To the extent the United States raises the medical quality assurance records privilege to specific requests for production, the Court will address each request further below, but in general the Court finds that records emanating from IHS' credentialing and privileging review fit squarely within the medical quality assurance privilege. A "medical quality assurance program" consists of "*any activity* . . . to assess the quality of medical care" and specifically includes activities conducted by "review bodies responsible for . . . credentials." 25 U.S.C. § 1675(a)(2). IHS submitted a declaration stating it has a risk management program and considers the credentialing and privileging process to be an activity carried out in furtherance of a medical quality assurance program. (Filing No. 180-2; Filing No. 183-2). The Indian Health Services Manual ("IHS Manual") provides that one of the "principal purposes and intended results" of the oversight of credentialing and clinical privileging process is "to provide quality health care to American Indian and Alaska Native patients." The IHS Manual defines "credentialing" as an "ongoing process" that includes information "utilized by the medical staff and governing body to evaluate competency and appropriately grant medical staff membership and/or clinical privileges." In turn,

"clinical privileges" are based on the review of an individual practitioner's professional training, licensure, experience, and expertise." (Filing No. 183-2).

In *Wheeler v. United States*, No. 17-2249-JTM, 2018 WL 2008865, at *3 (D. Kan. Apr. 30, 2018), the court determined physician credentialing and privilege files were medical quality assurance records protected from disclosure under a substantially similar statute:

> The application for, review of, and granting of medical privileges is a credentialing activity that occurs during a process in which the quality of medical care that a particular health care practitioner is capable of providing must be assessed, and thereby attempt to prevent medical incidents and risks. It is, quite simply, a part of the "medical quality assurance program" as defined by the plain language of the statute. Further, the documents memorializing that credentialing activity are reports that emanate from that medical quality assurance program and, therefore, are "medical quality assurance records" as defined by the plain language of the statute.

*Wheeler*, 2018 WL 2008865, at *3 (quoting *Benson v. United States*, No. 01-2148 (D. Kan. Sept. 6, 2002); see 10 U.S.C. § 1102. The confidentiality provisions for medical quality assurance records created by or for the Department of Defense under 10 U.S.C. § 1102 uses statutory language "virtually identical" to the language of 25 U.S.C § 1675. See 10 U.S.C. § 1102; see also *Soto*, 2014 WL 4704594, at *3 (using 10 U.S.C. § 1102 as "significantly persuasive authority" because the statutes are "virtually identical").

Plaintiff cites cases discussing state law "peer review" privilege as analogous to the privilege afforded by 25 U.S.C. § 1675 and suggests such privilege is narrow and waivable. (Filing No. 182 at pp. 14-15). However, the plain language of § 1675 is broader than the state law peer review privilege. Section 1675 applies to "*any activity* . . . to assess the quality of medical care," and although peer review activities may be encompassed within that definition, the statute's language does not limit the privilege solely to peer review activities. The statute contains no exceptions for disclosure of medical quality assurance records in this type of judicial proceeding. See 25 U.S.C. § 1675(d); see also *In re U.S.*, 864 F.2d 1153, 1155 (5th Cir. 1989)(finding medical quality assurance records under 10 U.S.C. § 1102 were not subject to discovery despite the United States' untimely objections to discovery requests). For these reasons, the Court finds that 25 U.S.C. § 1675 prohibits disclosure of records emanating from IHS' credentialing and privileging process, as they are activities to assess the quality of medical care at IHS.

Additionally, the Court finds FPPEs and OPPEs are protected from disclosure under 25 U.S.C. § 1675. The Winnebago Hospital bylaws and definitions describes that the purpose of the

FPPE and OPPE policy and procedure is to "ensure that patients are receiving quality, evidenced based care and treatment." (Filing No. 171-6). The OPPE "allows the Medical Staff to identify, on an ongoing basis, professional practice trends that impact on quality of care and patient safety." The FPPE is an "evaluation process [that] allows the organized medical staff to utilize a focused evaluation regarding a specific aspect of a practitioner's performance" for a variety of reasons, including "to confirm competence in the organization's setting," "[w]hen questions arise regarding a practitioner's professional practice during the course of [OPPE]" or "[w]hen there is a sentinel event associated with a specific practitioner, a serious practitioner-specific complaint, a provider's specific tort settlement, significant safety violation, or repeated or egregious unprofessional conduct." (Filing No. 171-5 at pp. 8-10). It is apparent that OPPE and FPPE evaluations and related documents and reports are exactly the type of record emanating from an "activity carried out . . . to assess the quality of medical care" of the IHS and are therefore protected from disclosure under § 1675.

Next, the Court also finds that many of Plaintiff's requests are overbroad in time and scope. This case pertains to the alleged medical malpractice occurred on March 21, 2016, when Ms. Drapeau presented in the emergency department at the Winnebago Hospital with breathing problems and was seen by Dr. Mahmoud, Robin Harris, R.N., and Dena Neiman, APRN.[4] Dr. Mahmoud requested no lab tests, diagnosed Ms. Drapeau with anxiety hypertension, and discharged her; Ms. Drapeau died two days later from DKA. This case also pertains to Plaintiff's allegations that pursuant to Winnebago Hospital procedure, Dr. Mahmoud, Harris, and Neiman reviewed Drapeau's medical records following her discharge from the hospital on the morning of March 21, 2016, and that such review should have prompted them to warn or notify Ms. Drapeau that she was suffering from DKA rather than anxiety hyperventilation. Finally, this case pertains to Plaintiff's allegations that Winnebago Hospital, Vista Staffing, and the United States negligently hired, supervised, and/or trained Dr. Mahmoud, Nurse Harris, and Nurse Neiman. Therefore, at this stage of the proceedings, discovery regarding Dr. Mahmoud, Nurse Harris, and Nurse Neiman's background before they were hired, and discovery regarding Dr. Mahmoud, Nurse

---

[4] However, according to Nurse Neiman's sworn declaration, she never saw, examined and/or provided any medical treatment to Ms. Drapeau in March 2016. Nurse Neiman worked in the Winnebago Hospital Clinic, had no job duties or responsibilities in the emergency department, and was not working at the hospital during any hours that Ms. Drapeau was there on March 21, 2016. (Filing No. 50-1).

Harris, and Nurse Neiman's performance and fitness while providing services at Winnebago Hospital may be relevant to these claims.[5]

IHS contracted with S.T.A.T. Team/GrapeTree and Vista Staffing to provide registered nurses, family practice doctors, and hospitalist medical doctor coverage services at Winnebago Hospital. Vista Staffing's contract with IHS was for August 1, 2015, through September 30, 2016. Dr. Mahmoud provided services to the hospital through the Vista Staffing contract from November 2015 through May 2016. Nurse Harris provided nursing services to the hospital from March 2016 through May 2016 under a contract with GrapeTree. Nurse Neiman was employed by the United States and worked at Winnebago Hospital from June 2014 through July 2016.

Keeping in mind these time frames and Plaintiff's specific allegations of negligence, and after review of Plaintiff's Request for Production of Documents (Filing No. 147-3), the United States' initial responses (Filing No. 147-7), the parties' briefs and supporting documents, and Judge Smith Camp's Memorandum and Order (Filing No. 77), the Court makes the following rulings regarding Plaintiff's request to compel supplementation of seventeen requests for production of documents:

> **Request No. 10**: For the period of January 1, 2014, through July 1, 2018, all "Documents," correspondences, emails, electronic communications, and letters (including any attachments thereto) regarding the termination or discontinuation of any services, work, or healthcare treatment (a) provided by Defendants, Dena Neiman, or "GrapeTree" to or for "Winnebago Hospital," "IHS," or "DHHS" or (b) provided by "DHHS" or "IHS" to or for "Winnebago Hospital."

Plaintiff's Position: This request seeks documents concerning the firing of these healthcare providers from Winnebago Hospital, Indian Health Services, and DHHS, which is relevant to the Plaintiff's claims against IHS and Winnebago Hospital for negligent hiring, training, and supervision, and is not overbroad or privileged by 25 U.S.C. § 1675. (Filing No. 146 at pp. 11-12; Filing No. 182 at p. 18).

United States' Position: The United States produced and identified documents that reflect when the contracts between the IHS/Winnebago Hospital and Vista Staffing and S.T.A.T. Team/GrapeTree Medical Staffing ceased. Plaintiff also has a copy of Dena Neiman's Standard Form 50 (resignation form) and resignation letter. (Filing No. 172 at p. 15; Filing No. 147-7 at p.

---

[5] To the extent that discovery is not privileged as a medical quality assurance record under § 1675.

6). The United States maintains its objections that additional documentation is overbroad and not proportional to the needs of the case, seeks documentation from timeframes outside of the date of alleged malpractice, is cumulative and duplicative of requests to the other co-defendants, and "may also run afoul of 25 U.S.C. § 1675." (Filing No. 172 at pp. 15-16).

Court Ruling: Plaintiff's request for the time period January 1, 2014, through July 1, 2018, is overbroad. The Court will limit this request to all documents regarding the termination or discontinuation of services, work, or healthcare treatment as to Dr. Mahmoud, Vista Staffing, Grapetree, Nurse Harris, and Nurse Neiman for the time period of July 1, 2015, through September 30, 2016. The United States does not have to supplement production to the extent it provides a sworn declaration that the responsive documents are solely contained in IHS' separate medical quality assurance file.

> **Request No. 14**: All "Documents," emails, and correspondences evidencing, showing, or memorializing any corrective actions, plans of correction, remedial measures, practice changes, procedure changes, policy changes, and/or rule changes that Defendants, Dena Neiman, "Winnebago Hospital," "DHHS," "IHS," or "GrapeTree" took at or for "Winnebago Hospital" in response to any jeopardy citations and/or immediate jeopardy citations that "Winnebago Hospital" received from 2011 through 2018.
> **Request No. 15**: All "Documents," emails, and correspondences regarding any CMS enforcement letters, Statements of Deficiencies, condition level deficiencies, CMS Termination Letters, compliance and noncompliance reports, compliance and noncompliance determinations, and noncompliances for "Winnebago Hospital" from 2011 through 2018.

Plaintiff's Position: These requests seek documents, emails and correspondence regarding corrective actions or changes to the Winnebago Hospital's practices, policies or rules following any jeopardy citations and/or immediate jeopardy citations the hospital received from 2011 to 2018 (Request No. 14) and regarding Centers for Medicare & Medicaid Services ("CMS") enforcement, deficiency, or termination letters or reports for the same time period (Request No. 15). Plaintiff maintains this information is relevant to her negligent hiring, training, and supervision claims as it will "provide background as to how the Defendants and others working at Winnebago Hospital were performing, including the operations of the Hospital itself," and "will show the multitude of deficiencies at the hospital that led to the loss of Medicare funding." Plaintiff asserts CMS requires a hospital to maintain a functioning laboratory to continue to receive Medicare funding, which

Plaintiff alleges in her proposed amended complaint Winnebago Hospital did not have. ([Filing No. 146 at pp. 12-13](); [Filing No. 182 at p. 19]()).

United States' Position: Information related to Winnebago Hospital's participation in Medicare over an eight-year period of time is not relevant. These requests are overbroad and not proportional to the needs of the case as they seek production of any document for a period of eight years for any aspect of the Winnebago Hospital across many entities, including two federal agencies. These requests also may require production of medical quality assurance records protected by § 1675. ([Filing No. 172 at pp. 17-18]()).

Court Ruling: Plaintiff's requests for all documents related to corrective action taken in response to immediate jeopardy citations and CMS enforcement documents that Winnebago Hospital received from 2011 through 2018 is facially overbroad in time and scope and seeks documents not relevant or proportional to the needs of the case. CMS terminated the Winnebago hospital's Medicare contract on July 23, 2015, and it was not in place one year later. ([Filing No. 62-3]()). The termination of Medicare funding therefore predated the alleged malpractice in this case (March 21, 2016), Vista Staffing's contract with IHS (August 1, 2015), Dr. Mahmoud's services to the hospital under the Vista contract (November 2015 through May 2016), and Nurse Harris' services to the hospital (March 2016 through May 2016). Corrective action and policy changes in response to any immediate jeopardy citations that Winnebago Hospital received unrelated to Dr. Mahmoud, Nurse Harris, and Nurse Neiman are not relevant to Plaintiff's claims that those individuals provided negligent treatment to Ms. Drapeau or were negligently hired and supervised. However, if Winnebago Hospital or IHS received immediate jeopardy citations or CMS noncompliance reports as a result of any actions of Dr. Mahmoud, Nurse Harris, and Nurse Neiman during the time they worked at the Winnebago Hospital, the United States shall produce those documents, and shall also produce any related documents concerning corrective actions, remedial measures, practice changes, and procedure/policy changes, taken in response to any immediate jeopardy citations resulting from any actions of Dr. Mahmoud, Nurse Harris, and Nurse Neiman, to the extent the latter is not contained solely within a separate medical quality assurance file.

**REQUEST NO. 16**: All "Documents," emails, and correspondences concerning any audits, evaluations, or investigations of the nursing services, medical services, the laboratory department/services, and/or the delivery of healthcare at

"Winnebago Hospital" at any point from January 1, 2008, through December 31, 2016.

Plaintiff's Position: Plaintiff is entitled to discovery regarding audits, evaluations, or investigations of Winnebago Hospital's nursing, medical, and laboratory services which directly relate to the quality and delivery of healthcare at Winnebago Hospital. (Filing No. 146 at p. 13; Filing No. 182 at p. 20).

United States' Position: Plaintiff seeks a nine-year production of documents for any aspect of the Winnebago Hospital and for any department, which is overbroad, irrelevant, and not proportional to the needs of the case. Plaintiff's request also may include medical quality assurance records. (Filing No. 172 at p. 19).

Court Ruling: Plaintiff's request for all documents related to audits, evaluations, and investigations of nursing services, medical services, lab services, and "delivery of healthcare" dating back to 2008 for the entirety of Winnebago Hospital is facially overbroad and not proportional to the needs of this case. Plaintiff's allegations of negligence pertain to Dr. Mahmoud, Nurse Neiman, and Nurse Harris and their treatment of Ms. Drapeau on March 21, 2016, and whether or not those individuals were negligently hired, supervised, and trained. Accordingly, the Court will direct the United States to supplement this request only as to audits, evaluations, and investigations of Dr. Mahmoud, Nurse Neiman, and Nurse Harris, from July 1, 2015, through December 31, 2016, to the extent those documents are not solely kept in a separate medical quality assurance file.

> **REQUEST NO. 36**: All "Documents" showing any conditions, discipline, disciplinary actions, disciplinary proceedings, sanctions, probation, revocations, or suspensions involving any medical licenses, nursing licenses, or the ability to practice medicine or nursing of Defendants Nevine Mahmoud, M.D., Robin Harris, and Dena Neiman.
> **REQUEST NO. 37**: All "Documents" showing any medical training, education, experience, and qualifications of Nevine Mahmoud, M.D., Robin Harris, and Dena Neiman.
> **REQUEST NO. 38**: All medical licenses ever held by Defendant, Nevine Mahmoud, M.D.
> **REQUEST NO. 40**: All curriculum vitas or resumes for Nevine Mahmoud, M.D., Robin Harris, and Dena Neiman.

Plaintiff's Position: The United States has not produced any documents concerning any disciplinary actions involving these individuals. These documents are relevant to Plaintiff's

negligent hiring claim because "If the United States did not obtain any of this information before they hired these three healthcare providers, then that is relevant[.]" Plaintiff also "wants to know if the United States generated, or received, any documents showing any medical training or education that was given to Dr. Mahmoud, Nurse Harris, and Nurse Neiman either before or while they worked for the United States." ([Filing No. 146 at pp. 14-15](#)).

United States' Position: The documents sought by these requests are unreasonably cumulative or duplicative and can be obtained from a more convenient source, namely, the individuals named in the requests, and is protected under § 1675 as part of the credentialing and privileging process. There are no such documents as it relates to Nurse Neiman and Dr. Mahmoud and Nurse Harris have responded to this request. ([Filing No. 172 at pp. 16-17](#)).

Court's Ruling: Plaintiff's requests are cumulative and duplicative, as the documents sought by the requests have already been produced to Plaintiff by the individuals named in the requests.


**REQUEST NO. 39**: All "Documents" showing the hospital or medical privileges of Nevine Mahmoud, M.D., Robin Harris, and Dena Neiman at or for "Winnebago Hospital" (including, but not limited to, the emergency, primary care, and inpatient departments of that hospital), "DHHS," "IHS," and Carl T. Curtis Health Education Center at any point in time.

Plaintiff's Position: This request seeks any hospital privileges that Dr. Mahmoud, Nurse Harris, and Nurse Neiman had to practice medicine at Winnebago Hospital, which is relevant to show whether (1) they were allowed to practice medicine at the hospital, (2) whether they were authorized to see patients like Ms. Drapeau at Winnebago Hospital, and (3) what types of medicine and procedures they could perform at the hospital, which goes to the level of their medical training, experience, and education. Plaintiff is entitled to discover what credentialing information was relied upon by the Government when it determined whether or not to grant privileges for Dr. Mahmoud, Robin Harris, or Dena Neiman to work at Winnebago Hospital. ([Filing No. 146 at pp. 15-16](#); [Filing No. 182 at pp. 21-22](#)).

United States' Position: IHS' privileging process is part of the credentialing process, which is protected from disclosure by [25 U.S.C. § 1675](#). ([Filing No. 172 at pp. 24-25](#)).

Court's Ruling: These are medical quality assurance records protected from disclosure by the United States under 25 U.S.C. § 1675, as discussed above.

**REQUEST NO. 42**: All (a) medical staff, employee, contractor, and governing body bylaws and (b) medical staff, employee, and contractor rules, regulations, policies, and procedures of "Vista Staffing," "Winnebago Hospital," "Grape Tree," "DHHS," and "IHS" that were in effect in March 2016 for any healthcare or medical care or treatment provided to or for anyone at "Winnebago Hospital" (including, but not limited to, the emergency, primary care, inpatient, and laboratory departments of that hospital).

Plaintiff's Position: Plaintiff seeks all policies that were in effect at the hospital, not just those that were in effect in the emergency department. Policies that were in effect in other areas of the hospital -- such as the inpatient, primary care, and laboratory areas of the hospital -- contain relevant information concerning the treatment of diabetes and diabetic ketoacidosis, (Filing No. 146 at pp. 16-18), and Plaintiff's negligent hiring, training, and supervision claim implicates the administrative, personnel, management, training, and compliance departments of the Hospital, (Filing No. 182 at p. 22).

United States' Position: This request is overbroad, irrelevant, and unduly burdensome. The United States has produced the applicable Medical Staff Bylaws, Rules, and Regulations of the Great Plains Indian Health Service. Furthermore, in response to a similar request for production, the United States produced all known, remaining policies in effect on March 21, 2016, related to care rendered at the Winnebago Hospital Emergency Room and all known, remaining policies in effect on March 21, 2016 related to the laboratory department at the Winnebago Hospital. (Filing No. 172 at p. 14).

Court Ruling: Plaintiff's request, although contained to policies in effect in March 2016, is overbroad in scope as it asks for all policies that were in effect across Winnebago Hospital. The Winnebago Hospital's policies regarding inpatient and primary care are not relevant, as Ms. Drapeau's care on March 21, 2016, was limited exclusively to the emergency department. However, the scope of relevance of this request is not as narrow as the United States suggests. For example, Winnebago Hospital policies and rules related to supervision and management of contractors such as Vista and GrapeTree, which staffed Dr. Mahmoud and Nurse Harris, may be relevant to Plaintiff's negligent supervision and hiring claim. Accordingly, the United States shall supplement its production to include policies in effect in March 2016 regarding supervision and management of contractors such as Vista Staffing and GrapeTree.

**REQUEST NO. 47**: All "Documents," emails, and correspondences regarding any chart reviews, medical records reviews, and/or health information management reviews performed with regard to (a) any services or treatment provided to Tonya Drapeau at any point in time, including, but not limited to, on March 21, 2016 and (b) any services or treatment provided on March 21, 2016, at "Winnebago Hospital."

**REQUEST NO. 49**: All "Documents," emails, and correspondences concerning any job performance evaluations, performance evaluations, quality assurance evaluations, and quality control evaluations with regard to any services or work that Nevine Mahmoud, M.D., Robin Harris, Dena Neiman, "Vista Staffing," and "GrapeTree" performed at or for "Winnebago Hospital.

**REQUEST NO. 50**: All "Documents," emails, and correspondences showing, evidencing, or memorializing any Ongoing Professional Practice Evaluations ("OPPE") and Focused Professional Practice Evaluations ("FPPE") with regard to any services or work that Nevine Mahmoud, M.D., Robin Harris, Dena Neiman, "Vista Staffing," and "GrapeTree" performed at or for "Winnebago Hospital."

Plaintiff's Position: These requests seek information concerning the performance reviews and evaluations of the individuals who provided medical and nursing services to Ms. Drapeau at Winnebago Hospital. The United States has not specifically demonstrated that these documents are privileged by 25 U.S.C. § 1675. (Filing No. 146 at p. 19; Filing No. 182 at pp. 23-24).

United States' Position: Plaintiff's requests explicitly seek documents that are confidential medical quality assurance records under 25 U.S.C. § 1675. Additionally, Request. No. 47(b) is overbroad as it requests all documents regarding "any services or treatment provided" at the hospital on March 21, 2016, which would include all services and treatments provided to any patient in the entirety of Winnebago Hospital. The United States has provided Plaintiff with known, responsive, and nonobjectionable materials in Response to Request 49, but objects to further production as privileged by § 1675. (Filing No. 172 at pp. 25-26).

Court Ruling: As discussed above, OPPE and FPPE are confidential medical quality assurance records protected from disclosure under § 1675. "[Q]uality control evaluations" also explicitly seek medical quality assurance records protected from disclosure under § 1675. However, "chart reviews, medical records reviews, and/or health information management reviews" are not necessarily encompassed by medical quality assurance records to the extent those chart reviews were performed by Dr. Mahmoud, Nurse Harris, and Nurse Neiman related to the care they provided to Ms. Drapeau on March 21, 2016, and the United States shall supplement its response to include responsive documents with that limitation.

**REQUEST NO. 51**: All Bylaws attestation statements that Nevine Mahmoud, M.D., Robin Harris, Dena Neiman, "Vista Staffing," and "GrapeTree" executed with regard [to] "Winnebago Hospital."

Plaintiff's Position: Winnebago Hospital required its healthcare providers to sign a "Bylaws Attestation statement" in which these providers acknowledged that they had received the hospital's Bylaws for practicing medicine at Winnebago Hospital and agreed to abide by them. The United States has produced the Bylaws that were in effect at Winnebago Hospital, but has not produced the "Bylaws Attestation statement" showing that Dr. Mahmound, Nurse Neiman, Vista Staffing, and GrapeTree had received the hospital's Bylaws, read the hospital's Bylaws, and agreed to abide by them in providing care for patients at Winnebago Hospital. (Filing No. 146 at pp. 19-20).

United States' Position: The United States has been unable to locate any of these documents as they relate to Robin Harris, Vista Staffing, or GrapeTree. To the extent these documents exist as for Dena Neiman and Dr. Mahmoud, those documents are contained within each individual's credentialing file, which is protected from disclosure by the medical quality assurance records privilege. (Filing No. 172 at p. 28).

Court Ruling: There is no evidence before the Court that bylaw attestation statements are created for or by the credentialing and privileging process as an "activity to . . . assess the quality of medical care," even if bylaws attestation statements are kept in an individual's credentialing file. Accordingly, the United States shall supplement its response to this request to include the requested bylaw attestation statements.

**REQUEST NO. 53**: All "Documents" that Nevine Mahmoud, M.D., Robin Harris, Dena Neiman, "Vista Staffing," "GrapeTree," Stat Team Nursing, Inc., and/or their agents, employees, and/or representatives provided to "Winnebago Hospital," "IHS," and/or "DHHS" to satisfy the "Credentials Checklist" identified at Filing No. 50-3, Page ID #229. (This Request includes all credentialing "Documents" supplied to or obtained by "Winnebago Hospital," "IHS," and "DHHS" with regard to Nevine Mahmoud, M.D., Robin Harris, Dena Neiman, "Vista Staffing," "GrapeTree," Stat Team Nursing, Inc.)

**REQUEST NO. 54**: All "Documents," emails, and correspondences regarding the medical/nursing credentials or credentialing of Nevine Mahmoud, M.D., Robin Harris, Dena Neiman, "Vista Staffing," "GrapeTree," [and] Stat Team Nursing, Inc.

<u>Plaintiff's Position</u>: These requests seek the information that was provided to Winnebago Hospital and IHS so that Dr. Mahmoud, Nurse Harris, and Nurse Neiman could practice medicine at Winnebago Hospital. The United States produced a "Credentialing Checklist" listing various documents that Dr. Mahmoud, Nurse Harris, Nurse Neiman, Vista Staffing, and GrapeTree were required to produce to IHS/Winnebago Hospital before they could practice medicine at Winnebago Hospital. This information is relevant to Plaintiff's negligent hiring, training, and supervision claim against the United States. (Filing No. 146 at pp. 20-21; Filing No. 182 at p. 25).

<u>United States' Position</u>: The documents and communications sought by Plaintiff are generated during the credentialing process, which is protected from discovery by the medical quality assurance privilege. Plaintiff can, and has, requested the credentials and qualifications of those named defendants from those individuals themselves, but the United States cannot produce the requested documents under § 1675. (Filing No. 172 at pp. 28-29).

<u>Court Ruling</u>: These are medical quality assurance records protected from disclosure by the United States under § 1675.


**REQUEST NO. 63**: For the period of January 1, 2015, through December 31, 2016, all complaints, documents, emails, letters, correspondences, messages, notes, and reports concerning or showing any drug or alcohol testing performed on Nevine Mahmoud, M.D., Robin Harris, R.N., Dena Neiman, R.N., and Brandon Smith. (Filing No. 146 at p. 22).

<u>Plaintiff's Position</u>: Request No. 63 seeks information concerning any drug and alcohol testing that was performed on Mr. Smith, Dr. Mahmoud, Nurse Harris, and Nurse Neiman for a two-year window. (Filing No. 146 at pp. 21-22).

<u>United States' Position</u>: The United States has provided drug testing results that were included in Brandon Smith's candidate file. The United States maintains that the remainder of this request is overbroad, irrelevant, and not proportional to the needs of the case. (Filing No. 172 at p. 29).

<u>Court's Ruling</u>: The United States shall search for and provide the results of any drug or alcohol testing performed on Dr. Mahmoud, Robin Harris, and Dena Neiman, during the time they provided services to Winnebago Hospital.

*iii.*     *ESI Disputes*

Plaintiff requests the Court to order the United States to perform additional searches for ESI using 34 search terms upon which Plaintiff and the United States previously agreed, plus an additional 15 search terms proposed by Plaintiff (Filing No. 146 at pp. 28-30), and to search four additional custodians previously agreed upon by the United States, plus an additional 11 custodians proposed by Plaintiff (Filing No. 146 at pp. 31-33).  Plaintiff requests all searches be performed for the time frame of January 1, 2015, through December 31, 2016.  Plaintiff contends the United States' proposed ESI protocol is far too narrow in scope and timeframe and excludes relevant custodians such as Mr. Smith and inquiries related to the Winnebago Hospital Laboratory.  (Filing No. 182 at pp. 25-39).

The United States thoroughly outlined the parties' extensive ESI discussions over the course of several months and the United States' efforts to search and produce non-privileged ESI. (Filing No. 172 at pp. 30-34).  The United States continued to supplement its production after Plaintiff filed the motion to compel, including production of results of additional electronic searches. See Filing No. 147-12; Filing No. 147-21; Filing No. 147-24.  The United States has proposed an ESI search protocol (Filing No. 173) with different proposed time frames for different categories of discovery, depending on the type of data sought.  (Filing No. 172 at p. 37-38).

Having thoroughly reviewed both parties' arguments and proposed ESI protocols, the Court finds that the United States' proposed date ranges, search terms, and proposed custodians are more proportional to the needs of the case as required by Fed. R. Civ. P. 26(b).  As discussed above, Plaintiff will not be given leave to amend her complaint to add new allegations against Brandon Smith and the Winnebago Hospital lab.  Many of Plaintiff's requested ESI custodians and search terms are tailored to production of discovery related to Brandon Smith, Titan Medical Group, LLC (the company that provided laboratory services), the laboratory itself, and laboratory supervisors and other lab staff members, none of which are relevant to any claim or defense in this case.

In sum, the Court will grant Plaintiff's motion to compel in part, as specifically discussed above, and will direct the United States to perform additional ESI searches in accordance with its ESI protocol, to the extent it has not already done so.

**B.  United States' Motion for Protective Order (Filing No. 167)**

The United States filed a Motion for Protective Order (Filing No. 167) to limit the content and scope of Plaintiff's Rule 30(b)(6) Deposition Notice directed to the IHS.  The United States contends several topics seek testimony regarding confidential information contained in Winnebago Hospital's quality assurance records, which are protected from disclosure pursuant to 25 U.S.C. § 1675.  The United States also argues that many of the topics are overly broad in scope and timeframe, irrelevant, vague or unclear, or seek cumulative information, information that can be obtained from another source, or expert testimony.  (Filing No. 169 at pp. 1-2).  The United States also moves for a protective order to prohibit Plaintiff from issuing a Rule 45 Subpoena Duces Tecum to Titan Medical Group, LLC, which was the company that staffed Brandon Smith and other contractors to the Winnebago Hospital lab.  (Filing No. 169 at p. 17).

Federal Rule of Civil Procedure 30(b)(6) provides that, in response to a notice or subpoena, a governmental agency must designate one or more persons who consent to testify on its behalf.  See Fed. R. Civ. P. 30(b)(6).  "The persons designated must testify about information known or reasonably available to the organization."  *Id.*  A Rule 30(b)(6) deponent "does not give his personal opinion" on a topic, but instead "represents the collective knowledge" of the corporation or governmental agency.  *CitiMortgage, Inc. v. Chicago Bancorp, Inc.*, No. 4:12-CV-00246 CDP, 2013 WL 3946116, at *1 (E.D. Mo. July 31, 2013)(citation omitted); *Waste Connections, Inc. v. Appleton Elec., LLC*, No. 8:12CV436, 2014 WL 1281918, at *3 (D. Neb. Mar. 27, 2014)(Thalken, M.J.)(quoting *QBE Ins. Corp. v. Jorda Enter., Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012)).  "The duty to prepare a Rule 30(b)(6) witness goes beyond matters personally known to the designee or to matters in which the designated witness was personally involved."  *Id.*  "Written discovery is not a substitute for a Rule 30(b)(6) deposition[.]"  *CitiMortgage, Inc.*, 2013 WL 3946116, at *2 (internal quotation marks and citations omitted).  A Rule 30(b)(6) deposition serves a unique function—it is the "sworn corporate admission that is binding on the corporation."  See *In re Vitamins Antitrust Litigation*, 216 F.R.D. 168, 174 (D. D.C. 2003).

As an initial matter, the Court will grant the United States' request for a protective order as it pertains to Plaintiff's proposed Rule 45 Subpoena to a non-party, Titan Medical Group because the subpoena requests no discovery relevant to this action.  See *ACI Worldwide Corp. v. Mastercard Techs., LLC*, No. 8:14CV31, 2016 WL 1170983, at *1 (D. Neb. Mar. 24, 2016)(Gossett, M.J.)("[An] adverse party has standing to object to a third-party subpoena on

grounds of relevance[.]").  Plaintiff's Rule 30(b)(6) topics 4-5, 7-14, 16-21, 25-33, 35, 39, and 49-53 similarly seek information about the Winnebago Hospital lab, Brandon Smith, and/or Titan Medical, and must be limited as those topics are not relevant to this litigation.  Fed. R. Civ. P. 26(b)(2)(C)(iii)(requiring a court to limit discovery if "the proposed discovery is outside the scope permitted by Rule 26(b)(1).").

The United States also seeks a protective order limiting Plaintiff's requested topics to relevant time frames, asserting that many of Plaintiff's requests contain excessive timeframes (Topics 2, 4-14, 18-21, 23-25, 26-33, 35, 45-47, and 46) or no time frames at all (Topics 1, 8, 10 - 11, 18, 25-26, 30-33, 35, and 39).  (Filing No. 169 at p. 18).  Plaintiff proposes to limit most of her proposed topics to a time period of January 1, 2015, through December 31, 2016, which the Court finds is a reasonable limitation for purposes of a Rule 30(b)(6) deposition.

The United States asserts topics 17-21, 23, 25-27, 30-31, 33, 39-40, 52, and 55 concern medical quality assurance records protected from disclosure under 25 U.S.C. § 1675.  As discussed above, 25 U.S.C. § 1675 prohibits disclosure of "Medical quality assurance records created by or for any Indian health program or a health program of an urban Indian organization as part of a medical quality assurance program[.]"  25 U.S.C. § 1675(b).  A "medical quality assurance program" consists of "*any activity* . . . to assess the quality of medical care" including activities conducted by "review bodies responsible for . . . credentials."  25 U.S.C. § 1675(a)(2)(emphasis added).  This protection extends to testimony:

> An individual who reviews or creates medical quality assurance records for any Indian health program or urban Indian organization who participates in any proceeding that reviews or creates such records may not be permitted or required to testify in any judicial or administrative proceeding with respect to such records or with respect to any finding, recommendation, evaluation, opinion, or action taken by such person or body in connection with such records except as provided in this section.

25 U.S.C. § 1675(c)(2).  The Court will address the application of this privilege to each disputed topic below.  Additionally, several of Plaintiff's topics suffer from the same overbreadth problems as her document production requests, as discussed above.  Keeping in mind the scope of relevant and proportional discovery (as the Court set forth above), the purpose of a Rule 30(b)(6) deposition, and the privilege afforded by § 1675, the Court makes the following rulings regarding the Plaintiff's proposed Rule 30(b)(6) topics (Filing No. 168-1 at pp. 17-25):

- Topic 1 is acceptable.

- Topic 2 is acceptable.

- Topic 4 shall be limited to the emergency room for the month of March 2016.

- Topic 5, after eliminating reference to Titan Medical, is acceptable.

- Topic 6 is acceptable with Plaintiff's timeframe limitation.

- Topic 7 is acceptable with Plaintiff's timeframe limitation.

- Topics 8-11, 13, and 16, after eliminating reference to Brandon Smith and Titan Medical, are acceptable.

- Topic 12, after eliminating reference to Brandon Smith and Titan Medical and with Plaintiff's proposed timeframe limitation of January 1, 2015, through December 31, 2016, asks for "The type, nature, and amount of services and work" that Dr. Mahmoud, Vista Staffing, and other Vista contractors healthcare providers provided at or for Winnebago Hospital. This topic as modified is reasonable and would be contained in records that are reasonably accessible to the United States.

- Topic 14, after eliminating reference to Brandon Smith and Titan Medical, asks for names and titles of the individuals at Winnebago Hospital and Vista Staffing "responsible for lining up and/or providing" Dr. Mahmoud, Nurse Harris, and Nurse Neiman to work at the Winnebago Hospital, and an explanation of the staffing process for both entities. While the United States would not, and should not, reasonably know what Vista Staffing's process is, this topic as limited to the Winnebago Hospital is acceptable.

- Topic 15 is acceptable.

- Topic 17 asks for Winnebago Hospital's "methodology, policies, processes, and procedures" to determine/select medical staff. Although the United States objects based on the privilege afforded to medical quality assurance records under § 1675, this topic does not ask for testimony regarding specific medical quality assurance records, but rather asks for general policy and procedures, which is the type of information contained within bylaws, the IHS Manual, or other non-privileged records reasonably available to the United States. As such, this topic does not request information protected by § 1675.

- Topics 18-21, after eliminating reference to Brandon Smith and Titan Medical, ask for "How, when, where, and why" Winnebago Hospital decided to contract with, do business with, or work with Vista Staffing and Dr. Mahmoud, "all conversations Winnebago Hospital" had

regarding those matters, and "any information" obtained, "all documents," and "paperwork" provided to or from Winnebago Hospital regarding Dr. Mahmoud and Vista Staffing prior to entering into those contracts or permitting them to perform work at Winnebago Hospital. These topics do, in part, request information protected by § 1675. "An individual who reviews . . . medical quality assurance records" or "who participates in any proceeding that reviews or creates such records may not be permitted or required to testify in any judicial . . . proceeding with respect to such records . . . or with respect to any finding, recommendation, evaluation, opinion, or action taken by such person or body in connection with such records[.]" 25 U.S.C. § 1675(c)(2). As stated above, "The application for, review of, and granting of medical privileges is a credentialing activity that occurs during a process in which the quality of medical care that a particular health care practitioner is capable of providing must be assessed," and is "a part of a "medical quality assurance program" under the statute. See *Wheeler*, 2018 WL 2008865, at *3. Documents memorializing that credentialing activity are reports that emanate from that medical quality assurance program and, therefore, are "medical quality assurance records" as defined by the plain language of the statute. *Id.* However, not all testimony requested by Plaintiff in these topics necessarily falls within the scope of the medical records privilege. For example, how Winnebago Hospital heard of Vista Staffing or the reasons the hospital decided to contract with Vista Staffing do not fall under the statute's privilege. But, specific questions regarding the decision to credential Dr. Mahmoud do fall within the statute. Rather than strike or attempt redraft these topics, the Court will direct the parties to proceed with the deposition consistent with the Court's discussion of § 1675 in this order. The United States may object to the extent specific questions concern records that emanate from quality assurance program activities under 25 U.S.C. § 1675(a)(2).

• Plaintiff's Topics 22, 46 and 47 ask for information regarding "The healthcare services and treatment" that Winnebago Hospital, the defendants, and Nurse Neiman provided to Ms. Drapeau from January 1, 2015, through March 23, 2016. While the utility of deposing a Rule 30(b)(6) representative about these topics is questionable, Plaintiff may inquire about factual information regarding the times and dates Ms. Drapeau was treated at the hospital, which medical providers saw her or treated her, what treatments she received, and other factual information of that nature— information that would likely be gleaned from billing records or other records that are reasonably accessible to the United States.

- Topic 23 asks for "All contact and communication that Winnebago Hospital has had with anyone (except its legal counsel) regarding Tonya Drapeau, the above-captioned lawsuit, and the healthcare services and treatment that were provided to Tonya Drapeau on March 21-23, 2016." Plaintiff clarifies in her brief that this topic seeks "to ask IHS questions about the communications it has had with the other Defendants in this lawsuit . . . concerning this lawsuit or the medical services that were rendered to Ms. Drapeau on March 21-23, 2016." (Filing No. 174 at p. 9). The Court will limit this topic to non-privileged written or recorded communications or other contact reasonably available to IHS that it had with the other Defendants regarding Ms. Drapeau between March 21-23, 2016.

- Topic 24 asks for "All contact and communication that Winnebago Hospital, Defendants, and Nurse Neiman had with Tonya L. Drapeau, Plaintiff, or Plaintiff's or Ms. Drapeau's family members from March 1, 2016, through the present date." This topic is vague, overbroad, and not proportional to the needs of the case.

- Topic 25 is acceptable with Plaintiff's timeframe limitation and after eliminating reference to Brandon Smith and Titan Medical. The United States may object to the extent specific questions concern communications that emanate from quality assurance program activities under 25 U.S.C. § 1675(a)(2).

- Topic 26, after eliminating reference to Brandon Smith, asks for training, education, experience, licenses, and qualifications of Dr. Mahmoud, Nurse Neiman, and Nurse Harris. While those named individuals are in a better position to discuss their training and qualifications, to the extent this information is contained in those individuals' personnel or employment files, and is not exclusively kept in a separately maintained quality assurance file, Plaintiff may inquire about these topics.

- Topic 27 is acceptable after eliminating subpart (c), for the same reasons discussed for Topic 17.

- Topic 28, after eliminating reference to Brandon Smith and Titan Medical, is acceptable.

- Topic 29, after eliminating reference to Brandon Smith and Titan Medical, and with Plaintiff's timeframe limitation, is acceptable. The United States may object to the extent specific questions concern "any finding, recommendation, evaluation, opinion, or action taken" in connection with medical quality assurance records, but the topic does not exclusively seek privileged information under § 1675.

- Topic 30, after eliminating reference to Brandon Smith and Titan Medical, is acceptable. ([Filing No. 181 at p. 4](#)).

- Topic 31, after eliminating reference to Brandon Smith and Titan Medical, seeks "All analyses, auditing, assessments, evaluations, inspections, and investigations" Winnebago Hospital performed "with regard to (a) any services or work" performed by Nurse Neiman, Nurse Harris, Dr. Mahmoud, and "Vista Staffing, "or (b) any of the abilities, education, experience, qualifications, skills, and/or training" of those individuals and Vista Staffing. This topic, with Plaintiff's timeframe limitation, is acceptable. The United States may object to the extent specific questions concern "any finding, recommendation, evaluation, opinion, or action taken" in connection with medical quality assurance records, but the topic does not exclusively seek privileged information under § 1675.

- Topic 32, after eliminating reference to Brandon Smith and Titan Medical, is acceptable.

- Topic 33, after eliminating reference to Brandon Smith and Titan Medical, asks for "All corrective actions, remedial measures, practice changes, lessons learned, best practices, procedure changes, policy changes, rule changes, safety changes, and/or any other changes considered, made, or implemented at or by Winnebago Hospital and/or IHS" as a result of or in connection to services or work performed by Nurse Neiman, Nurse Harris, Dr. Mahmoud, and/or Vista Staffing. This topic, with Plaintiff's timeframe limitation, is acceptable. The United States may object to the extent specific questions concern "any finding, recommendation, evaluation, opinion, or action taken" in connection with medical quality assurance records, but the topic does not exclusively seek privileged information under § 1675.

- Topic 34 is acceptable.

- Topic 35 seeks information about "All medical malpractice lawsuits or claims" filed or made against Nurse Neiman, Nurse Harris, Dr. Mahmoud, and Vista Staffing. This topic shall be limited to malpractice lawsuits or claims filed against these specific providers in connection with their work performed at Winnebago Hospital.

- Topic 36 shall be limited to claims against the specific medical providers named in Plaintiff's Amended Complaint.

- Topics 37-38 are acceptable.

- Topics 39-40 are privileged under 25 U.S.C. § 1675 for the reasons discussed above.

- Topics 41-44 are acceptable.

- Topic 45 shall be limited consistent with Plaintiff's proposed modification, which is agreed to by the United States. (Filing No. 181 at p. 13).

- Topic 48 is acceptable and seeks information arguably relevant to this case for the reasons identified by Plaintiff in her brief. (Filing No. 174 at p. 35).

- Topic 49-53 are not relevant to any claim or defense in this case.

- Topic 54 is acceptable.

- Topic 55 is not relevant to any claim or defense in this case for the same reasons discussed above.

Finally, the Court denies Plaintiff's request for attorney fees and costs, as the United States' positions were substantially justified. See Fed. R. Civ. P. 37(a)(5). Upon consideration,

**IT IS ORDERED:**

1. Plaintiff's Amended Motion for Leave to File Second Amended Complaint (Filing No. 141) is denied.

2. Plaintiff's Motion to Compel Defendant United States' Discovery Answers (Filing No. 145) is granted in part, as stated above. To the extent it has not already done so, the United States shall supplement its responses to discovery in accordance with this order on or before March 6, 2020, or within 21-days after the court enters a ruling resolving any objections to this order, whichever is earlier.

3. The United States' Motion for Entry of Protective Order (Filing No. 167) is granted in part, as set forth above.

Dated this 13th day of February, 2020.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge